NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**LYFT, INC.,**
*Plaintiff-Appellee*

**v.**

**QUARTZ AUTO TECHNOLOGIES LLC,**
*Defendant-Appellant*

---

2024-1089

---

Appeal from the United States District Court for the Northern District of California in No. 4:21-cv-01871-JST, Judge Jon S. Tigar.

---

Decided:  June 27, 2025

---

LAUREN J. DREYER, Baker Botts LLP, Washington, DC, argued for plaintiff-appellee.  Also represented by KARAN SINGH DHADIALLA, JEREMY TAYLOR, San Francisco, CA.

MICHAEL ROSEN, Irell & Manella LLP, Washington, DC, argued for defendant-appellant.  Also represented by ANDREW JEFFREY STRABONE, Los Angeles, CA; NICHOLAS T. PETERS, Fitch, Even, Tabin & Flannery LLP, Chicago, IL.

---

Before MOORE, *Chief Judge*, CHEN and CUNNINGHAM, *Circuit Judges*.

CHEN, *Circuit Judge*.

Quartz Auto Technologies LLC (Quartz) appeals from a final judgment of the United States District Court for the Northern District of California of non-infringement of U.S. Patent Nos. 6,847,871 ('871 patent) and 7,958,215 ('215 patent) in favor of Lyft, Inc. (Lyft). Quartz contends that the district court erred in construing the claim term "defective operational conditions in said automobile" in the '871 patent and the claim terms "alert" and "the event" in the '215 patent. For the reasons below, we *affirm*.

## BACKGROUND

Lyft sought declaratory judgment that it does not infringe certain claims of Quartz's '871 and '215 patents, among others. Quartz filed counterclaims of infringement. After briefing from the parties, the district court issued a claim construction order construing disputed terms in the '871 and '215 patents. *See Lyft, Inc. v. Quartz Auto Techs. LLC*, No. 21-CV-01871, 2022 WL 19975246 (N.D. Cal. Nov. 3, 2022) (*Claim Construction Order*). This appeal concerns the district court's construction of the following three terms: (1) "defective operational conditions in said automobile" in claims 1–5 and 10–14 of the '871 patent; (2) "alert" in claims 5 and 14–15 of the '215 patent; and (3) "the event" in claims 5, 14, and 16 of the '215 patent. *Id.* at *3–8.

Following the district court's claim construction order, the parties stipulated to non-infringement, "agree[ing] that under the [district] [c]ourt's constructions of such disputed terms, the accused instrumentalities do not infringe the asserted claims of the '871 and '215 patents." J.A. 13. The district court entered final judgment with respect to those claims, from which Quartz appeals. J.A. 11. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

"We review claim construction based on intrinsic evidence de novo and review any findings of fact regarding extrinsic evidence for clear error." *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1378 (Fed. Cir. 2021). "Claim terms are generally given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)).

I

We turn first to "defective operational conditions in said automobile" recited in claims 1 and 10 of the '871 patent.

A

The '871 patent is titled "Continuously Monitoring and Correcting Operational Conditions in Automobiles from a Remote Location Through Wireless Transmissions" and relates to the use of telecommunications to "continuously monitor and correct operating conditions in [an] automobile." '871 patent col. 1 ll. 10–12. The patent background explains that with the advent of on-board computing in automobiles, "self-diagnostics have been built into the automobile wherein defects or faults are often self-adjusted within the automobile without any apparent effect on operations." *Id.* col. 1 ll. 46–50. However, for more complex issues—such as "mechanical, physical, or electrical" faults—the on-board diagnostic system could not self-correct. *Id.* col. 1 ll. 50–54. In those more complex cases, the conventional diagnostic systems had a central storage module to log faults and defects that could not be self-adjusted, so they could be addressed later at a "diagnostic and repair shop." *Id.* col. 1 ll. 54–59; *see also id.* col. 3 ll. 45–50.

4              LYFT, INC. v. QUARTZ AUTO TECHNOLOGIES LLC

The patent sought to improve upon conventional on-board diagnostic systems by implementing a telecommunications system that wirelessly transmits sensor data collected by the automobile to a remote diagnostic center so that defective conditions may be detected in real-time and corrected when feasible. Independent claim 1 recites:

> 1. A system for continuously monitoring and correcting operational conditions in an automobile comprising:
>
>> a plurality of sensing devices in said automobile each device for respectively continuously sensing an operational parameter of said automobile;
>>
>> a wireless transmitter in said automobile for transmitting said continuously sensed parameters to a diagnostic station remote from said automobile;
>>
>> apparatus in said diagnostic station for analyzing said parameters in order to determine *defective operational conditions in said automobile*; and
>>
>> apparatus associated with said diagnostic station for wireless transmission of data relative to said determined defective operating conditions back to said automobile.

*Id.* at claim 1 (emphasis added); *see id.* at claim 10 (similar).

B

The district court construed "defective operational conditions in said automobile" as "defective operational conditions in said automobile of the type typically addressed at a diagnostic and repair center." *Claim Construction Order*, 2022 WL 19975246, at *3. Neither party proposed this construction. Lyft proposed construing this term as "an

operational condition that limits or prevents the automobile from operating," or alternatively, as "an operational condition of the automobile that may [be] adjusted or corrected." *Id.* (alteration in original). Quartz argued that the term does not require construction but also explained through its expert that the patent treats the term "as encompassing any operational defect that may require an adjustment or correction." *Id.* (citation omitted).

After rejecting Lyft's primary proposed construction, the district court characterized the remaining dispute between Lyft's alternative construction and Quartz's position as "whether operational conditions like driver attentiveness, passenger behavior, and hazardous road conditions fall within the scope of the asserted claims." *Id.* at *4. In resolving this dispute, the district court rejected Quartz's argument that claim 1 covers "*any* defective operating condition, regardless of whether it is 'of' the automobile." *Id.* Instead, the district court determined that "the specification makes clear that 'defective operational conditions' refers to conditions that are typically addressed at a diagnostic and repair center," *id.*, and issued its construction accordingly "[t]o clarify the types of issues that fall within the scope of the patent," *id.* at *5. In other words, the limitation refers to automobile-based defects only.

## C

Quartz argues that conditions unrelated to the automobile itself—including conditions like driver attentiveness, passenger behavior, and hazardous road conditions—fall within the scope of the asserted claims. We disagree.

The claim language alone does not resolve the dispute between the parties, i.e., whether conditions unrelated to the automobile itself are included within the scope of "defective operational conditions." The specification, however, is decisive here. *See Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1380 (Fed. Cir. 2016) ("Claim language must be viewed in light of the specification, which is the

'single best guide to the meaning of a disputed term.'" (quoting *Phillips*, 415 F.3d at 1315)); *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011) ("The customary meaning of a claim term is not determined in a vacuum and should be harmonized, to the extent possible, with the intrinsic record, as understood within the technological field of the invention.").

In the background section, the specification describes prior art vehicle systems that required a visit to "a diagnostic and repair shop" for "mechanical, physical, or electrical" defects that could not be corrected on-board. '871 patent col. 1 ll. 50–59. The patent purports to improve upon these prior art systems by enabling detection and correction of such defects through a remote diagnostic center. The specification states that what is "pertinent to the invention" is the way in which "defects in automobile operating conditions *requiring advanced detection and correction by diagnostic and repair centers* are detected and controlled" by a remote diagnostic center. *Id.* col. 3 ll. 12–17 (emphasis added). The specification further underscores this point with examples of automobile-based parameters and defects covered by the patent, including "automobile operating systems," *id.* col. 1 ll. 32–33, "valves and gauges," *id.* col. 3 ll. 21–22, and "diminished [tire] traction," *id.* col. 5 ll. 14–16. Nowhere does the specification suggest that "defective operational conditions" encompasses conditions unrelated to the automobile itself.

Quartz relies on the "diminished traction" example in the specification to argue that "the specification recognizes [diminished traction] may result from external factors such as wet weather conditions as opposed to any defect in the vehicle itself." Appellant's Br. 35; *see* '871 patent col. 5 ll. 9–22. But that is not what the specification says. In the relevant passage, the specification explains that "in the case where the sensed defect is diminished traction," the system may issue an appropriate warning "if the diagnostic center *also* becomes aware of potential wet weather

conditions." '871 patent col. 5 ll. 15–20 (emphasis added). In context, the diminished traction is the sensed defect, and the bad weather is a separate consideration that may inform the system to issue a warning. The specification does not state that the external condition (weather) is the cause of the defect (diminished traction), as Quartz suggests.

Accordingly, we agree with the district court that the scope of "defective operational conditions," as would be understood by a skilled artisan in light of the specification, is limited to automobile-based defects. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention.").

## II

We next turn to "alert" and "the event" recited in claims 5 and 14–16 of the '215 patent.

## A

The '215 patent is titled "System Management Using Real Time Collaboration" and relates to "managing information technology ('IT') devices." '215 patent col. 1 ll. 6–10. The background explains that maintaining and managing IT systems is important to avoid "lost productivity costs incurred when IT systems fail." *Id.* col. 1 ll. 26–29. It also explains that one issue with conventional IT management systems is "they do not ensure that the proper administrator received the alert and is going to take action to solve the problem." *Id.* col. 1 ll. 48–50. The patent notes that "[w]ithout a means to improve the response to IT problems, the promise of the information technology revolution may never be fully achieved." *Id.* col. 1 ll. 60–62.

To address these issues, "[t]he present invention provides a method of improving the response time to IT problems and ensuring that some[one] will respond to a problem." *Id.* col. 1 l. 66 – col. 2 l. 1. Independent claim 5 recites:

> 5. A computer-implemented method of managing an information technology device, comprising:
>
>> receiving an *alert* from a managed information technology device;
>>
>> receiving availability information about a plurality of candidates;
>>
>> automatically selecting a candidate qualified and available to respond to *the event* from among the plurality of candidates;
>>
>> automatically assigning responsibility for the alert to the candidate; and
>>
>> receiving a reply from the candidate indicating acceptance of responsibility for the alert.

*Id.* at claim 5 (emphases added); *see id.* at claim 14 (similar).

## B

The district court construed "alert" as "notice indicating a problem with or in a managed IT device." *Claim Construction Order*, 2022 WL 19975246, at *6. This was the construction that Lyft proposed. Quartz asked the district court to construe this term as "a notice describing an event." *Id.*

The district court noted that nothing in the claim language requires an alert to indicate a problem with or in a managed IT device. *Id.* However, turning to the specification, the district court determined that "the characterizations of the invention in the specification" combined with

"the lack of embodiments" unrelated to management of an IT device persuaded it that "the scope of the invention is limited to problems with or in managed IT devices." *Id.* at *7.

The district court next considered "the event" claim term. Although this term lacks an explicit antecedent basis in the claim, the district court relied on the specification and Quartz's expert to determine that a skilled artisan would understand that "the event" relates back to the claimed "alert," in that "the event" refers to "the condition that triggered the alert." *Id.* at *7–8. Based on its construction of "alert," the district court construed "the event" as "the problem with or in the managed IT device that triggered the alert." *Id.*

C

The parties agree that a relationship exists between "alert" and "the event." At oral argument, Quartz confirmed that it raises no separate claim-construction challenge for "the event," and that the constructions of the two terms "rise and fall together." *See* Oral Arg. at 30:25–44, available at https://oralarguments.cafc.uscourts.gov/default.aspx?fl=24-1089_05092025.mp3. Quartz also does not dispute that the terms relate to the management of IT devices.

Quartz does argue, however, that "alert" and "the event" need not relate to *problems* with or in those devices. In its view, the terms cover a broader range of subject matter. We disagree. While it is true that independent claims 5 and 14 do not expressly limit "alert" and "the event" to problems with or in IT devices, the "[c]laim language must be viewed in light of the specification." *Profectus Tech.*, 823 F.3d at 1380.

The summary of the invention states that "[t]he present invention provides a method of improving the *response time to IT problems* and ensuring that some[one] will

10          LYFT, INC. v. QUARTZ AUTO TECHNOLOGIES LLC

respond to a problem." '215 patent col. 1 l. 66 – col. 2 l. 1 (emphasis added); *id.* at Abstract (same); *see Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) ("When a patent describes the features of the 'present invention' as a whole, this description limits the scope of the invention." (cleaned up)). Other passages reinforce that the invention addresses problems with or in IT devices. *See, e.g.*, '215 patent col. 1 ll. 60–62 ("Without a means to improve the response to IT problems, the promise of the information technology revolution may never be fully achieved."); *id.* col. 4 ll. 1–2 ("In operation, the management system uses the monitoring system to detect problem conditions with the IT device . . . ." (figure reference numbers omitted)); *id.* col. 6 ll. 57–59 ("The monitoring systems can be any device, system, or computer program capable of detecting problem conditions in the monitored device." (figure reference number omitted)).

The terms "alert" and "event" are likewise tied to problems with or in IT devices throughout the specification and are often used interchangeably with each other *and* with IT problems. For example, the background section explains that an issue with prior systems is that they "do not ensure that the proper administrator received *the alert* and is going to take action to solve *the problem*." *Id.* col. 1 ll. 48–50 (emphases added); *see also id.* col. 3 ll. 64–65 (describing "a subject matter code for storing a code indicating the type of problem that generated the alert" (figure reference number omitted)). The specification also describes "*events* and triggers indicating *a problem* or fault condition." *Id.* col. 3 ll. 29–34 (emphases added); *see also id.* col. 4 ll. 18–27 (explaining that each monitoring system is "loaded with a list of *alert* identifier codes for the types of *problems* for which it is designed to monitor" and "monitors the IT device(s) until one detects an *event*." (emphases added) (figure reference numbers omitted)). Nowhere does the specification describe an "alert" or "event" as referring to anything other than a problem with or in an IT device.

This "repeated[] and consistent[]" usage "strongly suggests that" a problem with or in an IT device "should be read as part of the claim." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014); *see also UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 823 (Fed. Cir. 2016) (holding the "district court did not err in construing 'handheld device' as 'handheld direct pointing device'" because the "specification repeatedly emphasizes that the invention is directed to a direct-pointing system").

Quartz directs us to one passage in the specification, '215 patent col. 2 ll. 3–22, where a first paragraph discloses "[o]ne embodiment" involving "problem condition[s]," and a second paragraph discloses "[a]nother aspect of the present invention" using "alert[s]" and "event[s]" without expressly mentioning IT device problems. But Quartz ignores that this passage is immediately preceded by a clear statement that "[t]he present invention provides a method of improving the response time to IT problems and ensuring that some[one] will respond to a problem." '215 patent col. 1 l. 66 – col. 2 l. 1. Moreover, as already explained, the specification uses interchangeably "alert," "the event," and "problems" with IT devices. *See Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) (holding that although the use of different terms implies that they have different meanings, "that implication is overcome where . . . the evidence indicates that the patentee used the . . . terms interchangeably").

## CONCLUSION

We have considered Quartz's remaining arguments but find them unpersuasive. For the foregoing reasons, we *affirm* the district court.

## AFFIRMED

### COSTS

Costs to Appellee.